IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-01189-PAB-SBP

HAL EDWARDS,

    Plaintiff,

v.

CITY OF LEADVILLE,

    Defendant.

## ORDER ON DISCOVERY DISPUTE

    This matter is before the court pursuant to its procedures for resolving discovery disputes outside of formal motions practice. The disagreement centers on whether counsel for Plaintiff Hal Edwards is permitted to inquire into the content of communications between counsel for Defendant City of Leadville (the "City") and David Brown, an independent contractor who served as acting Police Commissioner for the City of Leadville, in connection with his deposition. The parties outlined their positions in a Joint Discovery Dispute Statement,[1] which they submitted on June 30, 2025. The court heard oral argument on the dispute on August 11, 2025. ECF No. 40.

    Having reviewed the parties' papers and the applicable case law, and having thoroughly considered the parties' respective positions as stated at the hearing, this court finds that communications between counsel for the City and Mr. Brown, in preparation for and during his

---

[1] The court will sometimes refer to that statement as the "JDS."

deposition, are privileged attorney-client communications. The undersigned therefore respectfully **ORDERS** that Mr. Edwards may not obtain the information at issue and upholds the City's assertion of the attorney-client privilege.

### A. Factual Context for Evaluating the Privilege Question

To explain its conclusion that the communications between Mr. Brown and defense counsel at issue here are protected, the court begins with a description of the facts demonstrating how Mr. Brown came to be involved in the matter and why his deposition was sought.

In this action, Mr. Edwards, a Black man, challenges his termination as Chief of the Leadville Police Department, *see generally* ECF No. 1, although the City contends that Mr. Edwards resigned after refusing to participate in a workplace conflict resolution plan. *See* ECF No. 14 at 4. As pertinent here, Mr. Edwards was suspended from his position as Chief on November 15, 2022. ECF No. 1 ¶ 52(b). Apparently, Mr. Brown—who Mr. Edwards describes as "a retired Lone Tree Police Department Commander," *id.* ¶ 52(d)(ii)—immediately assumed the role of acting Police Chief upon Mr. Edwards's suspension. *Id.* ¶ 54.[2] Mr. Edwards alleges that Mr. Brown, who is white, was brought on board at "*double Chief Edwards's salary*." *Id.* ¶ 67 (emphasis in original).

Mr. Brown was tasked with "filling the role of acting Chief of Police and providing guidance and leadership to the staff." *Id.* (cleaned up). At some point, however, the Leadville City Administrator—an individual named Laurie Simonson—directed Mr. Brown to investigate the complaints made by a group of six Leadville Police Department employees, whom Mr.

---

[2] The terms "Chief" and "Commissioner" are used interchangeably by the parties in describing the top official in the Leadville Police Department.

Edwards dubs the "insurgents." *Id.* ¶ 34 (alleging that these six employees, "four of whom are White and two Latino, . . . presented Simonson with a collective complaint against Chief Edwards in late October 2022"). According to Mr. Edwards, he had been investigated before Mr. Brown came aboard, and he contends that it was retaliatory for Ms. Simonson to order Mr. Brown "to investigate the insurgents' complaints *again*." *Id.* ¶ 55 (emphasis in original). With regard to Mr. Brown's investigation, Mr. Edwards criticizes Mr. Brown for not interviewing Mr. Edwards and for allegedly "taking the insurgents at their word." *Id.* ¶ 56.

The City appended to the Joint Discovery Dispute Statement a memorandum, prepared by Mr. Brown, setting forth the result of his investigation. *See* JDS Ex. 1 (memorandum from Brown to City Attorney Christiana McCormick and Simonson). Because the memorandum shows the scope and extent to which Mr. Brown was immersed in the work of the Police Department—and, in particular, how Mr. Brown's work is tied to Mr. Edwards's tenure as Chief—that document bears directly on the specific privilege questions raised here. The court therefore deems it appropriate to recount Mr. Brown's conclusions[3] in some detail.

Mr. Brown began by describing the purpose of his memorandum:

> This memorandum is being provided to the city attorney to provide my observations and related recommendations concerning the areas where the Leadville police department needs improvement concerning its operations, procedures, and training and request legal advice regarding the same.

*Id.* at 1. Mr. Brown stated that he gained information from "speak[ing] with the majority of the department staff, briefly look[ing] into the RMS [records management system], . . . and

---

[3] The court recognizes that Mr. Edwards disagrees with Mr. Brown's conclusions, but the accuracy of Mr. Brown's work is not relevant to the question of whether his communications with the City's counsel are privileged.

3

work[ing] on patrol with some of the officers and CSOs." *Id.*[4] Based on this information, Mr. Brown found that for "the sworn [Police Department] staff, . . . to be successful moving forward, . . . [they] will need continual training and strong hands-on leadership and guidance." *Id.* (cleaned up). Specifically, with regard to police officers—including, presumably, the "insurgents"—Mr. Brown made these additional observations:

- Officers stated they have little to no interaction with the Chief on a daily or weekly basis.

- The officers stated that when they ask the Chief for direction on a case they are working, they have been told numerous times to call the D.A.'s Office for direction.

- The officers report that the Chief uses bullying and inappropriate language when he has interacted with members of the staff such as discussions with the Chief stating "I am the f****** head of this department."

*Id.* at 1-2. Additionally, Mr. Brown noted deficiencies in department training and a general lack of knowledge in the arena of records management, resulting in a backlog of case-administration work that remained to be "completed, followed up on, or closed out." *Id.* at 2.

Mr. Brown next listed actions necessary to enable the Leadville Police Department "to be successful," including recommendations directly related to law enforcement officers:

- Sworn members and office staff need hands-on day-to-day mentoring and leadership.

- In order to provide the needed hands-on day-to-day mentoring and leadership, I believe that it is absolutely imperative the Chief's office be moved into the police department where he/she can work with the officers and oversee as well as direct the day-to-day operations. I believe that moving the Sergeant into the patrol area and moving the Chief's into the current Sergeants office, would give the Chief plenty of privacy when he/she needs to conduct private conversations or work on

---

[4] The court understands the commonly-used term "CSO" to refer to a court security officer.

confidential projects.

. . .

- Sworn Staff need to receive continuing training and education in the areas of Report Writing, 4th Amendment, DUI, Municipal Code and State Law (HB 217/HB1250 dealing with use of force, requirement for officers to intervene, and mandatory reporting of citizen contacts).

*Id.* at 2.

Mr. Edwards issued a subpoena seeking Mr. Brown's testimony at a deposition set for June 23, 2025. On behalf of Mr. Brown, Katherine M.L. Pratt, counsel for the City, waived service of that subpoena. *See* Waiver of Service of Subpoena dated May 16, 20205, JDS Ex. 2. Per Ms. Pratt's representation to the court in the JDS and at the discovery conference, "she represented Brown for the purpose of his deposition." *See* JDS at 9. Accordingly, Ms. Pratt met with Mr. Brown "to prepare him for his deposition testimony." *Id.*

At the deposition, per Ms. Pratt, "Plaintiff's counsel . . . had a full and fair opportunity [to] question Brown regarding ***all*** of his factual knowledge," *id.* (emphasis in original), and Mr. Edwards's counsel apparently does not dispute that point. The only questions Ms. Pratt refused to let Mr. Brown answer "pertained to her conversation with Brown in preparation for his testimony[.]" *Id.* at 9-10. Therein lies the dispute. Mr. Edwards wants to know what information Mr. Brown learned from Ms. Pratt in "his post-employment conversations" with her as she prepared him for deposition, as well as what Ms. Pratt discussed with Mr. Brown during breaks in the deposition. *Id.* at 1, 6.

  B.  **The Parties' Positions on the Privilege Question**

To support his argument that he must be allowed to probe communications between Mr. Brown and Ms. Pratt, Mr. Edwards urges the court to adopt the reasoning in what he describes as

5

the "seminal case" of *Peralta v. Cendant Corp.*, 190 F.R.D. 38, 41 (D. Conn. 1999). *See* JDS at 2. In *Peralta*, as here, the plaintiff sought to obtain information that the defendant's counsel had discussed with the witness, a former Cendant employee, in preparing the employee for deposition.

The *Peralta* court decided the question by focusing its analysis on the employment status of the deponent, drawing a bright line between information the employee acquired when he was employed and information he learned after he left the company. If the employee acquired information during his employment, he could discuss that information with the attorney without breaching the privilege. *Id.* at 41 (finding that pre-deposition communications between the corporate attorney and the former employee, limited to the "underlying facts in this case," remain privileged). However, per the *Peralta* court, no privilege applied to communications from the attorney that "went beyond" the former employee's "knowledge of the circumstances of plaintiff's employment and termination, and beyond [the former employee's] other activities within the course of her employment with the defendant[.]" *Id.* And so communications between counsel and the employee that occurred after the employment ended, related to her deposition preparation and testimony, were not privileged. *See id.* The motivating rationale for this line is that the latter communications might "influence [the former employee] to conform or adjust her testimony to such information, consciously or unconsciously." *Id.* Applying the *Peralta* analysis here, Mr. Edwards would be entitled to probe, for example, what Ms. Pratt communicated to Mr. Brown about "facts developed during the litigation, such as testimony of other witnesses, of which [Mr. Brown] would not have had prior or independent personal knowledge[.]" *See id.* That, apparently, is precisely the type of information Mr. Edwards wants to know.

6

To be sure, many courts have adopted the *Peralta* division between information the employee obtained during employment and information the employee gleaned from his conversations with counsel post-employment. That includes one case in this District. *See Corcoran v. HCA-HealthONE LLC*, No. 23-cv-02377-NRN, 2022 WL 1605296, at *4 (D. Colo. May 20, 2022) (concluding that "the *Peralta* decision should guide any future deposition questions and answers to and from former [hospital] employees" in a case raising employment-discrimination claims). The City, however, argues that the court should reject a blanket application of *Peralta*—an out-of-Circuit and out-of-District case which does not bind this court—and counters that there is a "better reasoned approach": one that does not "arbitrarily focus[] on the witness's employment status," but rather "on the purpose of the attorney-client privilege and its application to the witness in question." JDS at 6, 8.

The court finds it expedient to carefully examine the City's legal argument, and Mr. Edwards's rejoinder, in light of the specific factual record here.

**C.   Analysis**

Federal common law governs the application of the attorney-client privilege in this case in which Mr. Edwards bring claims under federal law and subject-matter jurisdiction arises under 28 U.S.C. § 1331. *See Burke v. Regalado*, 935 F.3d 960, 1023 (10th Cir. 2019) (citing Fed. R. Evid. 501). "Under federal common law, the attorney-client privilege generally applies to 'communications made in confidence by a client and a client's employees to an attorney, acting as an attorney, for the purpose of obtaining legal advice.'" *Collardey v. All. for Sustainable Energy, LLC*, 406 F. Supp. 3d 977, 980 (D. Colo. 2019) (quoting *Sandra T.E. v. South Berwyn Sch. Dist. 100,* 600 F.3d 612, 618 (7th Cir. 2010) (citing *Upjohn Co. v. United States*, 449 U.S.

7

383, 394-99 (1981); *In re Qwest Commc'ns Int'l Inc.*, 450 F.3d 1179, 1185 (10th Cir. 2006) (stating that a "critical component of the [attorney-client] privilege 'is whether the communication between the client and the attorney is made in confidence of the relationship and under circumstances from which it may reasonably be assumed that the communication will remain in confidence'") (quoting *United States v. Lopez*, 777 F.2d 543, 552 (10th Cir. 1985)); *see also Gottlieb v. Wiles*, 143 F.R.D. 241, 249 (D. Colo. 1992) (recognizing that "the *sine qua non* for invocation of the privilege is that the communications in question were intended to be confidential") (citations omitted).

        **1.**        **Mr. Brown Was a City Employee for Purposes of Evaluating Privilege**

As an initial matter, the court finds that Mr. Brown's status as an "independent contractor" when he served as the acting Leadville Police Chief does not preclude the application of the attorney-client privilege to communications between the City's counsel and him. Whether or not Mr. Brown was technically an "employee" of the City, the record here confirms that he was the "functional equivalent" of an employee for purposes of this court's assessment of the privilege. The court proceeds to explain why.

"The District of Colorado and other courts have adopted the 'functional equivalent' test enunciated in *Horton* [*v. United States*, 204 F.R.D. 670, 672 (D. Colo. 2002)] to help determine whether to extend the attorney-client privilege to third parties acting at the behest of a client or their attorney." *A.H. ex rel. Hadjih v. Evenflo Co.*, No. 10-cv-02435-RBJ-KMT, 2012 WL 1957302, at *3 (D. Colo. May 31, 2012). The party asserting the privilege must make a "detailed factual showing" that the third party is the "functional equivalent" of an employee. *Horton*, 204 F.R.D. at 673. The "functional equivalent" test has been distilled "down to three basic elements

with respect to outside consultants: (1) 'whether the consultant had primary responsibility for a key corporate job,' (2) 'whether there was a continuous and close working relationship between the consultant and the company's principals on matters critical to the company's position in litigation,' and (3) 'whether the consultant is likely to possess information possessed by no one else at the company.'" *Hadjih*, 2012 WL 1957302, at \*3 (quoting *Export-Import Bank v. Asia Pulp & Paper Co., Ltd.*, 232 F.R.D. 103, 113 (S.D.N.Y. 2005); citing *LG Electronics U.S.A., Inc. v. Whirlpool Corp.*, 661 F. Supp. 2d 958, 962 (N.D. Ill. 2009) (adopting the functional equivalent test)). The record here confirms that Mr. Brown's work for the City readily satisfies the elements of the "functional equivalent" test.

First, Mr. Brown unquestionably had "primary responsibility" for the "key" City job of Police Chief—the exact position from which Mr. Edwards contends he was removed because of discriminatory animus and the catalyst for this lawsuit. *Hadjih*, 2012 WL 1957302, at \*3. While Mr. Brown obviously spent some time on investigatory tasks related to Mr. Edwards's suspension by looking into "the areas where the Leadville police department needs improvement," JDS Ex. 1 at 1, he gained this knowledge as he conducted the day-to-day work of Police Chief. As Mr. Brown explained, he worked patrol with line correctional officers in order to gain an in-depth understanding of their practices at that time, identifying those subjects on which they required additional training. *Id.* at 1-2. That is an analysis he could not have made without performing the actual job of Police Chief. Furthermore, the record leaves no reason to doubt that Mr. Brown bore full responsibility for the department during his tenure. The record reveals no other person who was charged with running the department when Mr. Brown held the reins as Chief.

9

Second, the record confirms that Mr. Brown possessed "a continuous and close working relationship" with City officials, including the officers who worked the streets of Leadville, "on matters critical to the [City's] position in this litigation." *Hadjih*, 2012 WL 1957302, at *3. Mr. Brown's written summary of his observations shows that he had numerous conversations with police officers and other department staff and that he was so immersed in department work as to be able to identify—and call out—a problematic lack of knowledge in proper records administration and behavior for which he found no "legal justification." *See* JDS Ex. 1 at 1-2. These observations, which only Mr. Brown can convey to a jury, are critical to the City's position that Mr. Edwards's tenure as Chief was marked by unacceptable deficiencies in performance.

Lastly, the record plainly demonstrates that Mr. Brown is in possession of information that could not be replicated in the testimony of any other current or former City employee. *Hadjih*, 2012 WL 1957302, at *3. He is, after all, the person who immediately stepped into the Chief's role following Mr. Edwards's departure, placing him in the singular position of being able to describe a snapshot in time—as seen from the perspective of another law enforcement professional—before any changes to departmental operations were made. He thus possesses the ability to explain, from a chief's perspective, the impact of Mr. Edwards's management of the department on other department personnel, including the line officers with whom Mr. Brown interacted on a daily basis, in close proximity in time to Mr. Edwards's departure. In these important respects, Mr. Brown would appear to be a witness in a class of one.

In this context, the court respectfully declines to countenance Mr. Edwards's dismissive characterization of Mr. Brown as just a "former short-term contractor" for the City. JDS at 1. No

doubt Mr. Brown's time in Leadville was brief; he was purposely brought in to sustain the department in an interim capacity. His specific agreement was "to continue providing supervision, direction, and assistance for the police department through December 23, 2022 at the latest." JDS Ex. 1 at 1. Time in position, however, is not a component of the functional-equivalent analysis. *See Hadjih*, 2012 WL 1957302, at *3. No doubt Mr. Brown "did not temporarily overlap with Plaintiff," *id.* at 5, and it may also be the case that Mr. Brown was not formally involved in any "decisions or input regarding Plaintiff's employment." *Id.*[5] But neither of these things are determinative of functional equivalence. Mr. Brown's stature as functionally akin to an employee does not hinge on his direct interactions with Mr. Edwards, but rather on his responsibility for the job of Police Chief; his continuous and close working relationship with Leadville officials in a manner that informs the City's position in this litigation; and his ability to relay a picture of the department on the heels of Mr. Edwards's departure.

In light of this record, the court finds that the City has succeeded in making "a detailed factual showing that the non-employee"— Mr. Brown—"is the functional equivalent of an employee and that the information sought from [him] would be subject to the attorney-client privilege if he were an employee of the party." *See Hadjih*, 2012 WL 1957302, at *4. Therefore, on the particular record here, the court finds that Mr. Brown merits the status of "employee" for purposes of the privilege analysis. *See id.* at *3 (recognizing that, "[a]s with corporate

---

[5] It is unclear from the record here whether there is support for the latter contention. In providing his "observations and related recommendations concerning the areas where the Leadville police department needs improvement" in the immediate aftermath of Mr. Edwards's departure, *see* JDS Ex. 1 at 1, this court cannot say with certainty that Mr. Brown had no "input" with respect to Mr. Edwards's employment.

11

consultants, application of the privilege to communications with an independent contractor is determined on a case-by-case basis") (citation omitted).

Accordingly, there is no principled justification for denying the protection of the attorney-client privilege to communications involving Ms. Pratt and Mr. Brown simply because Mr. Brown was a contractor when he performed the duties of Chief.

### 2. The Communications at Issue Are Privileged

Having confirmed that Mr. Brown should be treated in the same manner as a City employee for purposes of assessing the attorney-client privilege, the court now must determine whether his status as a *former* employee negates the privilege as to his post-employment communications with Ms. Pratt is connection with his deposition. To make that assessment, the court begins with *Upjohn*.

In extending the attorney-client privilege to communications between counsel and a broad group of employees, the Supreme Court observed that some of the communications were between counsel and individuals who were no longer employed by the company. *See* 449 U.S. at 394 n.3. However, the Court declined to address whether the privilege also applied to communications with these former employees. *Id.* (noting that "[n]either the District Court nor the Court of Appeals had occasion to address this issue, and we decline to decide it without the benefit of treatment below").

In a concurring opinion, Chief Justice Burger criticized his colleagues for not explicitly confirming that communications between an attorney and a former employee of the client are privileged: "Because of the great importance of the issue, in my view the Court should make clear now that, as a general rule, a communication is privileged *at least when*, as here, an

12

employee or former employee speaks at the direction of the management with an attorney regarding conduct or proposed conduct within the scope of employment." *Id.* at 402-03 (emphasis added). The Chief Justice—while recognizing that "[o]ther communications between employees and corporate counsel may indeed be privileged"—stated that the privilege should apply, at a minimum, in the following circumstances: "The attorney must be one authorized by the management to inquire into the subject and must be seeking information to assist counsel in performing any of the following functions: (a) evaluating whether the employee's conduct has bound or would bind the corporation; (b) assessing the legal consequences, if any, of that conduct; or (c) formulating appropriate legal responses to actions that have been or may be taken by others with regard to that conduct." *Id.* at 403 (citations omitted).

Since *Upjohn*, the Tenth Circuit Court of Appeals has not issued a decision "discussing whether communications involving former employees of a corporation can be protected by attorney-client privilege[.]" *Collardey*, 406 F. Supp. 3d at 981 n.3. However, as Chief Judge Brimmer of this District went on to observe in *Collardey*, "other circuits to address the question have 'concluded that the distinction between present and former employees is irrelevant for purposes of the attorney-client privilege.'" *Id.* (quoting *Sandra T.E.*, 600 F.3d at 621 n.4 ("[m]ost lower courts have followed the Chief Justice's reasoning [in *Upjohn*] and granted the privilege to communications between a client's counsel and the client's former employees"); *see also In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 658 F.2d 1355, 1361 n.7 (9th Cir. 1981), *cert. denied*, 455 U.S. 990 (1982) ("Although *Upjohn* was specifically limited to current employees, the same rationale applies to the ex-employees (and current employees) involved in this case. Former employees, as well as current employees, may possess the relevant

13

information needed by corporate counsel to advise the client with respect to actual or potential difficulties.") (internal citation omitted); *Admiral Ins. Co. v. U.S. Dist. Ct. for Dist. of Arizona*, 881 F.2d 1486, 1493 (9th Cir. 1989) (rejecting as "without merit" the argument that communications with a former employee were not privileged because the former employee was "a de facto third-party witness") (citing *In re Coordinated Pretrial Proceedings*, 658 F.2d 1355).

Looking to Chief Justice Burger's articulation in *Upjohn* of the test for assessing whether communications with a former employee are privileged, the record demonstrates that each component of that analysis is satisfied here. Ms. Pratt represents the City in this litigation and indisputably possesses the authority "to inquire into the subject[s]" on which Mr. Brown was slated to testify in his deposition. *See* 449 U.S. at 403. Furthermore, any discussion between Ms. Pratt and Mr. Brown logically would have been geared toward "assessing the legal consequences" of his conduct while he served as acting Chief, as well as "formulating appropriate legal responses to actions" that Mr. Brown took—specifically, by means of preparing him to respond to questions Mr. Edwards's counsel was likely to ask him in the deposition. *See id.* And it is clear from the instant record that Ms. Pratt was obliged to closely evaluate Mr. Brown's conduct during his tenure as Chief, which might bind the City in this litigation. *See id.* After all, the City chose to retain Mr. Brown as the acting Police Chief in the immediate aftermath of Mr. Edwards's suspension, placing him at the top of the police department hierarchy. In short, per the test anticipated in *Upjohn*, Ms. Pratt's communications with Mr. Brown are protected from compelled disclosure.

Additionally, in contrast with the deponent in *Peralta*, Ms. Pratt in fact represented Mr. Brown for purposes of the deposition. *See* JDS Ex. 2 (Waiver of Service of Subpoena to Brown

signed by Pratt); *see also* JDS at 9 (argument by the City that "Plaintiff's counsel did not raise any objection when undersigned counsel's representation was to their advantage"); *cf. Peralta*, 190 F.R.D. at 42 (noting that the former employee was one "whom counsel does *not* represent") (emphasis added). Thus, the communications between Mr. Brown and Ms. Pratt also meet the criteria for attorney-client privilege under federal common law, where the record demonstrates that Mr. Brown sought legal advice from Ms. Pratt, a professional legal advisor; engaged in communications with her for that purpose; intended those communications to remain confidential; and, like the City, has not waived the privilege. *See Roe v. Catholic Health Initiatives Colorado*, 281 F.R.D. 632, 636 (D. Colo. 2012) (recognizing that, "[u]nder federal common law, the attorney-client privilege arises (1) where legal advice of any kind is sought; (2) from a professional legal advisor in his capacity as such; (3) the communications relating to that purpose; (4) made in confidence; (5) by the client; (6) are at his instance permanently protected; (7) from disclosure by himself or by the legal advisor; (8) unless the protection is waived").

Put simply, the record before the court evinces a situation in which the "communication [at issue] was made in confidence for the purpose of obtaining legal advice from the lawyer." *Id.* at 637. Notably, that intended confidentiality flows both ways. Having taken up the mantle of acting Chief directly after Mr. Edwards, Mr. Brown is uniquely situated to give Ms. Pratt information she needs "to advise [the City] with respect to actual or potential difficulties" in its defense of this lawsuit. *See In re Coordinated Pretrial Proceedings*, 658 F.2d at 1361 n.7.

The court therefore concludes that the attorney-client privilege protects the communications between counsel for the City and a witness (also represented by counsel for

15

purposes of the deposition) who assumed the role of Chief immediately after Mr. Edwards—affording him particularized knowledge of the functioning of the department at that crucial time—and who spoke with the City's attorney in order to defend against the litigation. In this context, it is difficult to see how *Peralta's* dichotomy between the knowledge Mr. Brown acquired during his employment and his post-employment communications with Ms. Pratt would have any practical application.

To the extent the pre-deposition communications between Ms. Pratt and Mr. Brown concern Mr. Brown's actions during his employment with the City, it is apparent that those communications would be privileged even if the two were discussing *recent* testimony—say, testimony from Mr. Edwards expressing disagreement with some aspect of Mr. Brown's investigation and assessment of Mr. Edwards, or testimony from one of the police officers who complained about Mr. Edwards. Without question, that "new" testimony itself would not have been known to Mr. Brown at the time of his employment, but any discussion of that testimony with the City's attorney would be so wholly intertwined with facts Mr. Brown already knows from his employment as to prohibit the court from effectively parsing "privileged" from "unprivileged" content.

It may be that the record in *Peralta* admitted of an easier demarcation between facts the former employee "was aware of as a result of her employment" and "facts developed during the litigation . . . of which [the former employee] would not have had independent personal knowledge." *Peralta*, 190 F.R.D. at 41. Here, however, the court finds the implementation of such a distinction impractical, at best, and inconsistent with a proper application of the law

governing the attorney-client privilege to the particular facts here.[6]

In sum, Mr. Brown's deposition-related communications with Ms. Pratt, who represented him in connection with that process, are shielded from discovery by the attorney-client privilege.

**D.     Conclusion**

Consistent with the foregoing, the court finds that the communications between counsel for the City of Leadville and David Brown, which occurred in preparation for and during Mr. Brown's deposition, are privileged attorney-client communications. The undersigned therefore respectfully **ORDERS** that the City of Leadville's assertion of the attorney-client privilege is upheld.[7]

---

[6] Even if the court were to conclude that the attorney-client privilege does not apply to the deposition-related communications between Mr. Brown and Ms. Pratt, those communications may constitute protected work product, as the court recognized in *Peralta*. *See* 190 F.R.D. at 42 (observing that "[t]o the extent the communications are specifically [the attorney's] conclusions or opinions, they may be covered by work product protection under Fed. R. Civ. P. [] 26," but that "the work product doctrine will not preclude inquiry into other non-privileged communications as set out above"). In the JDS, the City did not specifically invoke the work-product doctrine as a possible additional protection for these communications or explain how the doctrine might apply in a context in which an attorney represents a former employee in a deposition. Therefore, the court does not take up that question here. *See, e.g.*, *Asia Pulp*, 232 F.R.D. at 112 ("Pre-deposition conversations may also be work product; to the extent Ex-Im's attorneys communicated their legal opinions and theories of the case [to non-party witnesses], their conversations are immune from discovery.") (citing *Peralta,* 190 F.R.D. at 42); *but see Corcoran*, 2022 WL 1605296, at *4 ("If a lawyer is dumb enough to tell her trial strategy to a former employee of the client, and the former employee has no ongoing duty of confidentiality with respect to information learned post-employment, then opposing counsel is free to inquire about it and the former employee can answer questions in deposition without infringing on the attorney work product doctrine.").

[7] Rule 72 of the Federal Rules of Civil Procedure provides that within fourteen (14) days after service of a Magistrate Judge's order or recommendation, any party may serve and file written

17

DATED: October 20, 2025    BY THE COURT:

_____
Susan Prose
United States Magistrate Judge

---

objections with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. §§ 636(b)(1)(A), (B); Fed. R. Civ. P. 72(a), (b). Failure to make any such objection will result in a waiver of the right to appeal the Magistrate Judge's order or recommendation. *See Sinclair Wyo. Ref. Co. v. A & B Builders, Ltd.*, 989 F.3d 747, 783 (10th Cir. 2021) (firm waiver rule applies to non-dispositive orders); *but see Morales-Fernandez v. INS*, 418 F.3d 1116, 1119, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review, including when a "pro se litigant has not been informed of the time period for objecting and the consequences of failing to object").